Go ahead. May it please the Court, Catherine Curtis for petitioner. I would like to reserve two minutes for rebuttal. Sure. The Board of Immigration Appeals and Immigration Court found that there was no legal authority for the proposition that adjustment of status application is an extraordinary circumstance and excuses an untimely asylum filing. Senator, I can't hear you very well. You should speak into the microphone. Sorry, Your Honor. I will try. I moved it a little closer. There are two problems. Speak a lot more loudly and slowly. Your voice is both going back and forth. Okay. There are... Yeah, both voices. You've got to speak directly into the microphone. Sorry, Your Honor. Is this better? That's better. Okay. There are two problems with these findings. First, the Immigration Court and Board of Immigration Appeals in rendering this decision per se concluded that adjustment of status could not be an excuse for untimely filing without conducting an individualized analysis as required by this Court and WAKERI, the Board of Immigration Appeals and YC, and the express wording of the regulations. Even assuming, arguendo, that they did conduct an individualized analysis, the Immigration Court and Board of Immigration Appeals applied an incorrect legal standard. By requiring that adjustment of status be part of the regulation or specified in case law, they ignored the language of the regulations, which states that the examples may include but are not limited to the list of exceptions in the statute. Regulatory intent to avoid forcing a premature application for asylum. Congressional... Let me ask you something. Yes. You have all that in your briefs, right? Correct, Your Honor. We've read the briefs. So why don't you just look at us, think about Judge Nuna, and tell us why you believe your client is entitled to help. I believe that he relied on his eligibility for adjustment of status when he failed to file for asylum. And it was based on his reliance upon the possibility for adjustment of status that he was delayed in filing for his asylum relief. But for that reason... Were you his lawyer? I was not his lawyer at the time that he was in front of the immigration judge. Who was his lawyer? It was another lawyer in our firm. Her name was Armanet, but I was not the attorney at that time. Your voice is fading out. Okay. I'll continue to try to speak. All right, Your Honor, sorry. I was not the attorney at that time. All right. Now, he's been in this country for 13 years. That's true, Your Honor. And what work has he been doing? His work varies. At the time that he was in proceedings, he had been in school. At this time, I believe he... What's he doing now? I believe he works for a gas station. You don't know what he's doing? Ms. Curtis, I've got a question for you. Was your client married in Egypt? Sorry, I couldn't hear you very well, Your Honor. Your client was married in Egypt? A previous marriage occurred in Egypt. The marriage at issue in this case that promulgated the adjustment occurred here in the United States. Was he divorced in Egypt? He was divorced here, but the marriage took place in Egypt. He was divorced? I'm talking about his first marriage. When was he divorced from his first wife? Your Honor, I'm not certain, but it's my understanding he was divorced in Egypt. Sorry, divorced here in the United States once he came here. I'm sorry, I don't get your answer. He was divorced in Egypt? It's my understanding he was divorced in Egypt, but I'm uncertain, Your Honor. I don't believe that's been established in the record. Well, now he was being public. Let's say he was in Egypt because he had married the Christian woman, but he's divorced from her. So what's the problem? Well, the issue was with the second wife. He was married once he was here, and he proceeded with the adjustment based on that marriage. No, but what was the problem in Egypt for him? He's divorced from the Christian wife. Well, according to honor-killing standards, divorce does not preclude him from still being subject to honor-killing because the issue is with honor to the family. In fact, divorce could arguably make the matter worse if her family perceived that his divorce was some kind of insult to his ex-wife, and that could actually be the reason that he could be subject to honor-killing, and I believe that was his main argument. Well, I don't understand that at all. I really don't see what he did in Egypt. But the immigration judge found that it was credible that he would be subject to an honor-killing if he returned and granted withholding, right? Yes, Your Honor. And I believe the withholding is rule of law in this case. It's not been disputed by the government. So I believe it's been established that he is at risk of being persecuted in Egypt if he returns. I saw it now. I don't understand why. I believe that the reasoning was the issue of honor-killing. There is a proposition in Egypt, and it is common, that if a person can be killed, it's getting a lot of interest. Let me ask you this. I thought, this is what I understand, that they broke up in Egypt. Her family had her go through an abortion, right? Huh? Correct. Is that right? Okay. And then she got a divorce. Henry, I'm having great difficulty hearing you. All right. The wife, the Christian wife, was pregnant. The family didn't like this idea of this marriage. So they got her back home. She got an abortion. And what I understood was that she got a divorce under Egyptian law. And then he came here. He married another woman, and now he's divorced from her. That second marriage was just to keep him in the country, wasn't it? There's no evidence of that in your office. I don't know. You know he got divorced. But so, see, the only thing I can think might help him would be to have the matter go to mediation. Have you thought about that? We have considered it. I've discussed it with the client. Based on his withholding removal grant, he wanted to push forward with possibility for asylum. Your Honor, I see I'm approaching the two-minute mark. Would you like me to complete the answer to the question? Yeah, go ahead. Tell me. Yeah. I mean, because he already has withholding, it was his belief that completing mediation and closing the case doesn't put him in any different position than he is with withholding. He's got withholding now. Correct. So he's safe for the present time. Correct. Okay. Well, and is there any ñ I mean, what would ñ only if there were changed country conditions such that honor killings didn't exist anymore would he be sent back to Egypt, correct? That's generally the only time when that would occur, yes. It would have to be a changed circumstance in Egypt that no longer puts him at risk of persecution. Okay. And the sole reason that he was denied asylum was because he missed the one year. Correct, Your Honor. That was the sole reason. So what are the extraordinary circumstances that excuse his having missed that one year? We're arguing that his belief that he was eligible for the adjustment and his pursuit of that adjustment are his extraordinary circumstances. We've equated them with lawful permanent residence, understanding that it isn't actually lawful residence, but noting that the adjudicator's field manual recognizes that the application for asylum puts a person under color of law. They have the permission to remain here. They are ñ That would be a new law, wouldn't it? I mean, I don't know if it's in the regulations. It would be us making a new law, wouldn't it? It would be ñ it's not in the ñ it's not new law because the code of ñ the code of federal regulations are broadly defined. They list a group of exceptions, but they make it quite clear that those exceptions ñ sorry, I'm getting a lot of information. Let's just back off a little. Okay. They make it quite clear that that list of exceptions is not meant to be extraordinary. So in order to expand it to this case, you're not creating new law. You're just doing a fact-specific analysis to determine that this case does present extraordinary circumstances. Well. Okay. But he would have ñ he would have been on time had your other member of your firm not dropped the ball. No, I don't because our firm was not representing him when he did the adjustment. We took over years later when his adjustment had already been denied. So he was in proceedings as a result of the denial of the adjustment, and that's when we took over. Well, I thought you said something about ñ you talked about another member of your firm. They did represent him originally in immigration court proceedings. I was answering who represented him below before the immigration court. Yeah. We did represent him there, but the adjustment had ñ was filed affirmatively, which means it was filed with USCIS before he was even put into proceedings. It was pending for several years. It was pending from March 2002 to March 2013. Sorry. To March 2003. So it was pending for about a year. And then he was immediately placed in removal proceedings, and that's when our firm began representing him. So he was well past the one-year deadline by the time his adjustment was denied. And we're arguing that the adjustment application is an extraordinary circumstance that permits him to file asylum at a time. Well, I have a different theory on this. Why don't you sit down and let me go through it with the government. Okay. Thank you. May it please the Court. Good morning. My name is Jesse Buse, and I represent the Attorney General. Can I go through something with you? I'm going to go through a timeline with you. Yes, Your Honor. Okay. Recognizing that extraordinary circumstances, the list of extraordinary circumstances isn't all-inclusive. Judge Warner, I can't hear you at all. Sorry. Okay. We all recognize that the list of extraordinary circumstances in the Code of Regulations isn't all-inclusive, right? Yes, Your Honor. Okay. Let me go through something with you. Okay. He entered September 28, 2001, right? Yes, Your Honor. Okay. He filed his adjustment of status in March of 02. Yes, Your Honor. Okay. So that is a period of about five to six months, right? Yes, Your Honor. Okay. Then it took almost a year for the adjustment of status to be denied, right? They denied it. Well, actually, I'm not sure. Maybe a year. 3-26-03. It was almost exactly a year. Almost exactly one year. I have another question about that, but first I want to do this timeline. Okay. Then he was the notice to appear was issued April 17, 03, right? Yes, Your Honor. So that's one month. That was one month. Within one month. Less than one month, right? Yes, Your Honor. So if you were to say equitably tall or something, the one-year period of while his adjustment petition was pending, then you'd have a total of, I would say, less than seven months that ran between the time of his entry and the time of the notice to appear, right? Yes, Your Honor. And once the notice to appear issued under your regulations, he could not file a defensive asylum application until he had a hearing in front of the immigration judge, right? Well, he could file it with the immigration court. I mean, he could file it with the clerk's desk there. But, yes, he can file it before the judge. Well, the regulation says he has to file it at his master hearing, his calendar. Yes, Your Honor. Right? That's what the regulation says. So he went to the immigration judge, and he wanted to file his defensive asylum application, but he couldn't because he had three hearings in front of the immigration judge where the immigration judge didn't have his file. So each time he appeared, they had to continue his hearing because his file wasn't there. It was continued for that. I'm not sure that that would prevent him from having filed it in court because those were master calendar hearings. But they didn't have his file. But he had it. He was ready to file it. He couldn't file it. And so the first time that he appeared in front of the immigration judge who actually had his file so he could file his defensive asylum application, he filed it. And that was May 2nd, 2003. So I'm just wondering whether or not a lot of this really wasn't within his control. I understand the agency's assumption that, well, he made a wrong strategic choice. He went for the adjustment instead of filing his asylum, and he could have done both. But not every new person to this country actually knows ins and outs of all the asylum laws. And if it was so clear that it was inevitably going to be denied, why did it take the BIA a year to deny it? Well, I have two answers to that. I think one with respect to the timeline and the other with respect to the reasonable period. Right. I have two problems with this. I think that the I.J. here found that he was certainly sophisticated enough to have filed this application. He stated he had this fear of harm when he came to the U.S. So the minute he came into the U.S., that one-year bar should have started running. And it was he didn't file, even assuming that we cut off the date when he was put into proceedings, which would have been April or May 2003. Of 17, 2003. Right. He entered in September 2001. So over a year and a half. But I'm saying if he took out the year where he was proceeding under the adjustment. And a big part of your argument is, well, it was clear he was not going to be entitled to adjustment because he was statutorily barred. But my feeling is if it was so clear, why did it take the agency a year to deny it? Well, I can't speak to the timetables for that. I'm saying, yes, you should. You should be able to, because your whole argument is that it was really clear he was statutorily barred from this, and so he shouldn't have filed the asylum. Well, the other issue is even if we say there's something to excuse the period where he filed the asylum application, the adjustment application, he still has nearly seven months where he didn't file anything. Right. It's unaccounted for. Seven months. But. It's a year bar. The problem is, Your Honor, that both this court and the board have said a reasonable period to file doesn't mean another year. The court in Uliavidi v. Holder has said that, and I'm citing the right case. I may be citing the wrong case, but I believe this court is, oh, it was in Huseyev v. Mukasey, actually, has said that, in general, a six-month period to file after extraordinary circumstance is the general rule. I'm not sure if this is actually, I think the period I calculate, because the only reason I can't calculate precisely is I don't have the precise date when he filed his adjustment of status application, but I think it's somewhat less than seven months. Well, it was, well, again, that we have kind of not a hard rule, but a general ruling that a six-month period is what is reasonable. Okay. So wholly apart from that. But, again, this wasn't something that the I.J. reached because they found no extraordinary circumstances. I know. But so wholly aside from that, so the I.J. had a hearing before the I.J. The I.J. found him credible. The I.J. found that he's going to be persecuted, possibly killed, if he returns to Egypt. Is there some reason why the agency would not want to grant him asylum? I mean, the sole thing is his technicality of this one year? Well, the reason is the one-year bar. It's a technical point of law that the immigration judge couldn't ignore when determining his statutory eligibility for asylum. It's a gatekeeper rule. They don't even get to eligibility. You have to first determine whether he's filing the application. Well, I'm asking in terms of Judge Preyerson's point about mediation. I mean, he says he didn't want to do mediation. She says he didn't want to do mediation because he wants asylum. I mean, could you mediate the question around the or is it your position you think it was, the adjustment was based on a sham marriage? Well, we didn't, the I.J. didn't get that far in the intermission. There certainly could be an issue there that could be a basis for a discretionary denial. But that has not been explored at all. So I can't speak to that because I have nothing from the agency on that issue. Are you willing to mediate? I'm not sure that mediation would be fruitful simply because at this stage we have an I.J. on the board applying this rule that DHS has defended, and just from a practical perspective, I'm not sure that we'd be able to agree to send the case back for a hearing on asylum. I'd certainly be willing to mediate on the issue. Can I ask which agency within the Department of Justice you're with? I'm with the Office of Immigration Litigation. Okay. Because I agree, I think only if the agency took a second look at this, looking at the timeline and looking at what happened, would he have a chance at immigration. Again, I'm not sure that mediation would be the answer to that, just because I'm not sure that the agency, our client agencies, would agree to remand, just from a purely practical perspective. It's certainly something I. . . Have you committed any crimes? The record doesn't reflect it up to the time that he. . . And I believe there were background checks for withholding that didn't find anything that would bar him from withholding. But, again, it's different standards. I don't know what he says. Well, I'm just looking at the Morton memo under the new Barack Obama policy. I'm a little. . . Right. . . . worried about, you know, denying people relief when we had this whole thing pending. And I think mediation for these purposes, we would not oppose. I, again, on the merits, I'm not sure practically that it would get us anywhere. On the new memos, again, you know, we're still looking at those, so I'm not sure how that would apply. And, again, from a practical perspective, I'm not sure what, if anything else, it would get him. But we're still working this out. He's got withholding, so he's not going to be sent back to Egypt. He's not going to be sent back to a country that would harm him. He's in no danger of harm. So what's the difference is that he's not going to attract to citizenship, right? Right. He doesn't. . . He can't apply for a green card based on. . . Withholding is probably better than the new Barack Obama program. Because that's only for three years, right? Right. And it would be deferred action. So it would defer any removal up until the three-year period or until something else changes, as far as I understand it. But, again, he's not. . . He could potentially be removed if there were changed circumstances in Egypt. He could potentially be removed to a third country. But he'd have a chance to show whether he'd be harmed there. But I'm not sure that from practically that he's in any danger of being removed. Well, there was a time when his application for asylum was in his file. Is that right? There was a time. . . I'm not sure I understand the question. Was there an application for asylum in his file? Not until he filed it with the Immigration Court. I don't believe he had any other application prior to that. And when did that go in? That would have been May 2, 2003, when he filed it. And that was the application that was, you say, a year late. Over a year from his time of entry. And in the interim, he was awaiting a ruling on the suspension issue. Yes. He'd applied for adjustment of status based on his marriage. And is there anything in the file that would indicate something perhaps that was said to the I.J. that he was thinking about filing an asylum application? Well, I believe he testified that he wanted to apply for asylum when he entered the U.S. But after he met his second wife and told her his story, the wife said, no, we can get married and then you can apply for adjustment of status instead. So it seems from his own testimony that he was certainly thinking about applying for asylum prior to his marriage, but opted not to in favor of only pursuing adjustment. And he had an attorney at that time? I am not sure. The record doesn't reflect whether he had an attorney or not. Well, I mean, someone represented him? Again, I'm not sure. He filed an application with USCIS or his wife filed a visa petition with USCIS and he filed an adjustment application. But I'm not sure if they did that pro se or if they sought the help of counsel to do so. They're divorced now, too, though, right? Yes, they are. Okay. Thank you. Thank you. Your Honors, if I could just make a couple of points regarding his comments on his failure to file even after the adjustment. I wanted to point out a couple of important points on that factor. Even though six months has been a presumptive deadline, this court in Wake Green made it clear that that should be determined on a case-by-case basis and that it's not a pro se rule. And also, in the hearings before the immigration judge, the immigration judge consistently kind of cut him off. And the first hearing he began to say, to express kind of problems in Egypt, he said, you know the American's all dead. There's not much elaboration on that because right after he said that, the immigration judge cut him off and said, sir, we'll get that from your file and we'll discuss that. Repeat that. He had expressed, you know the American's all dead. And that's it. The American's what? The American's all dead. It's not a very clear statement. The American's all dead. Yeah. It's at 125 of the appellate record. The immigration judge cut him off at that point and said, sir, we'll get that from your file and we'll discuss that when you return. So he did begin to express his fear, and that was even at the first hearing. But the immigration judge consistently cut him off when he began to express himself and wouldn't let him proceed because they didn't have the file. And at each hearing at that time, the immigration judge started off with the statement that he didn't have the file and wouldn't let Mr. Rezek continue from there. So I would argue that in light of the fact that he was really precluded by the immigration judge from filing until the time when he actually did. Well, how was he precluded from filing? The regulations state that he has to file the operating manual for the immigration court specifies that he has to file in open court in a master calendar hearing. He has no choice. He can't take it into a window because it's not allowed. Because he's been served with the notice of appearance. Exactly. So he's in proceedings, and therefore he must file it within the proceedings. Yes. And the regulations make clear that once the NTA is filed with the immigration court, they have exclusive jurisdiction. So he was required to file it at a master calendar. And at every time he would have been able to, the immigration judge cut him off and prevented him from moving any further because he kept saying, we don't have your file. The first time they had the file was at the hearing where he actually did file the immigration application, that fourth hearing. So if you were to exclude the time where the adjustment of status petition was pending, what is the precise time that had elapsed? I did create a timeline. It was from the time that his adjustment was pending. His adjustment was filed. When did he file the adjustment? March 27, 2002. There's a fee receipt in the record at 293 of the appellate record. So that was, okay, so that's. It was within one year of his filing, several months after his filing. And then his adjustment of status was pending until March 26, 2003. So nearly one year. He filed about seven months after that, if I remember correctly. Seven months. Not quite seven months. Yeah, February 3, 2004 was when he filed. But we're arguing that that was the first time he could file because he was precluded from filing before that. So even though it was seven months, it was a reasonable delay because he was in immigration court proceedings, was trying to raise the fear to the immigration judge, and was precluded from moving forward because they didn't want to file. That covers the seven months. Is there any case law that says that filing the adjustment of status is or is not? There is not published case law, but there is an unpublished case from the Ninth Circuit, which is Hagigpour, which was cited in the record, which was finding that adjustment of status can amount to an extraordinary circumstance. Sorry, it's Hagigpour, and they had found that an adjustment of status could amount to an extraordinary circumstance. The site for that is 2011 Westlaw 3152365. It's a 2011 case from the Ninth Circuit. It is unpublished. But there aren't any published cases on the subject. Okay. So the government distinguishes that case by saying that it was inevitable that the adjustment of status would be denied here, whereas there it wasn't inevitable. I think that's their argument to distinguish that case. Right. And I don't believe that inevitability precludes him from being eligible for extraordinary circumstances. My take on that was if it was so clear, you know, why did it take the agency a year to deny it? And I think that's a well-taken point, that, you know, if they would have denied it. They can reject a filing for lack of jurisdiction before it even goes to an interview, before anything is processed. They've been better off if they had just rejected it for lack of jurisdiction because he was statutorily ineligible, something he didn't know, but they should have. Yeah. So, yeah. And I would argue that that does very much favor his position, that it wasn't so clear. And also that, you know, there's nothing in the Code of Regulations that say that there's no mistake of law. In fact, if a person makes a mistake in their asylum application, files it and it's rejected because they made some kind of mistake, he can still be eligible for an extraordinary circumstance. So, Your Honor, may it please the Court, the Respondent would submit on that. Any further questions from the Court? Thank you. Thank you. Does the Government have any? Would you like to rebut anything that was said here, surprised you? Your Honor, I think we made our argument clear in the briefs with respect to the issues that were raised here. And distinguishing that side of the case? I can't pronounce it. I'm not used to it. Agitator, I believe. Okay. We distinguished that both based on the fact that there wasn't much in the way of analysis. And, in fact, it said that. It was a memorandum disposition. Right. So that's why it's not here. But it analogized it to the having legal status in the United States, saying that the regulations recognize that having legal status is an exceptional circumstance, but didn't note that applying for adjustment doesn't give you legal status. And the Government submitted just a couple days ago, and I apologize for the short notice, a very recent decision. Rehata? Rehata, or something along those lines, that reached a somewhat different conclusion on. Is it also unpublished? It is also unpublished. So I agree that there's no published precedent on this specific issue. I guess it would depend on the circumstances. I mean, that's the extraordinary circumstances rule. I mean, it has to take into account all these different factors. Yes. That is, as counsel pointed out in a brief matter of YC, states that there has to be an individualized analysis, which Bajaj conducted here, finding that based on his particular set of circumstances, he didn't establish extraordinary circumstances. And so that's what I'm saying. All right. Thank you. Thank you. Anything you want to add? Just one last thing. I'll give you the last word. I would just add that the immigration judge didn't do a sufficiently individualized analysis. Well, I don't think that all these facts that I'm bringing out of the record were necessarily even considered because they weren't put before the IJ. Well, I mean, they were presented through testimony. It is in the record. But there's no indication she considered any of the facts from the record. While she did state a couple things about his education level, that was about all she discussed. The only other facts were in his favor, but she doesn't point out why while those facts appear to be in his favor that he filed the adjustment, that doesn't warrant relief. She just makes a bold statement. What bothers me is that they accepted his adjustment application and then took a year to deny it, and now they're arguing that he was never even eligible for that. But if they had told him that within the year, he would have gone for the alternative relief. That's very much true, Your Honor. It bothers me as well, so. But that was all.   This matter is submitted.
judges: Pregerson, Noonan, Wardlaw